IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


DAVID K. MAHLE,                    )
                                   )
        Plaintiff,                 )
                                   )
            vs.                    )        Civil Action No. 05-292
                                   )
JO ANNE B. BARNHART,               )
Commissioner of Social Security,   )
                                   )
        Defendant.                 )


**MEMORANDUM OPINION**

## I.    INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff David K. Mahle and Defendant Jo Anne B. Barnhart, Commissioner of Social Security. Plaintiff seeks review of final decisions by the Commissioner denying his claims for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.*[1] Plaintiff's motion is denied, Defendant's motion is denied, and the matter is remanded for

---

[1]  A person is eligible for supplemental security income benefits if he is "disabled" (as that term is defined elsewhere in the regulations) and his income and financial resources are below a certain level. 42 U.S.C. § 1382(a). To be granted a period of disability and receive disability insurance benefits, a claimant must show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured. 42 U.S.C. § 423(a).

1

further proceedings in light of the Opinion which follows.

## II.   BACKGROUND

A.   <u>Factual Background</u>

David Mahle worked as an over-the-road truck driver for many years and then as a truss builder for mobile homes.  In March 2001, he returned to driving until he was injured in a fall from the back of a truck in October 2001.  At the time he applied for benefits, Mr. Mahle stated that he suffered from anxiety attacks, bilateral carpal tunnel syndrome, lumbar back pain, bilateral bowler's elbow, and a Tarlov's cyst[2] in his back.  (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 6, "Tr.," at 83.)  He had also experienced multiple admissions to the hospital for heart-related problems and psychiatric episodes, and been treated for migraine headaches, depression, and arthritis.  Although he continued to work for more than two years after the onset of some of these conditions, he stopped working on October 15, 2002, because of pain associated with his physical conditions, "a very bad problem dealing with people," and the effects of his numerous medications on his ability to drive safely.  (Tr. 83.)

---

[2]  According to the National Institute of Neurological Disorders and Stroke, a Tarlov cyst is a fluid-filled sac, most often affecting nerve roots in the sacrum, which can compress nerve roots, causing lower back pain, sciatica, urinary incontinence, sexual dysfunction, and/or loss of feeling or control of movement in the leg and/or foot. *See* www.ninds.nih.gov/index.htm.

B.   <u>Procedural Background</u>

On February 27, 2003, Mr. Mahle protectively filed for disability and supplemental security income benefits (Tr. 73-75 and 705-706, respectively.)  Both applications were initially denied on September 22, 2003 (Tr. 42-46 and 708-712), after which Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ") on November 7, 2003.  (Tr. 47.)

On February 3, 2005, a hearing was held before the Honorable John J. Mulrooney at which Plaintiff was represented by counsel. Judge Mulrooney issued his decision on March 21, 2005, again denying DIB and SSI benefits.  (Tr. 13-26.)  The Social Security Appeals Council declined to review the ALJ's decision on August 3, 2005, finding no error of law or abuse of discretion and concluding the decision was based on substantial evidence to support his findings. (Tr. 6-8.)  Therefore, the March 21, 2005 opinion became the final decision of the Commissioner for purposes of review.  42 U.S.C. § 405(h); <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* <u>Sims v. Apfel</u>, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on October 5, 2005, seeking judicial review of the ALJ's decision.

C.   <u>Jurisdiction</u>

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of

the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

### III. STANDARD OF REVIEW

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999).  Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential,

including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.)  If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion.  Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), citing Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV.  LEGAL ANALYSIS

### A.   The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income or disability insurance benefits, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[3] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last for not less than twelve months.  42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).

---

[3]  According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis."  "Gainful work activity" is the kind of work activity usually done for pay or profit.

To determine a claimant's rights to either SSI or DIB,[4] the ALJ conducts a formal five-step evaluation:

(1)  if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2)  if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3)  if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4)  if the claimant retains sufficient residual functional capacity[5] ("RFC") to perform his past relevant work, he is not disabled; and

(5)  if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); *see also* <u>Morales</u>, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts

---

[4]  The same test is used to determine disability for purposes of receiving either type of Social Security benefits. <u>Burns v. Barnhart</u>, 312 F.3d 113, 119, n1 (3d Cir. 2002).  Therefore, courts routinely consider case law developed under both SSI and DIB applications.

[5]  Briefly stated, residual functional capacity, or RFC, is the most a claimant can do despite his recognized limitations.  Social Security Ruling 96-9 defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule." *See also* 20 C.F.R. § 416.945.

to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[6] <u>Sykes v. Apfel</u>, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Mulrooney first concluded that Mr. Mahle had not engaged in substantial gainful activity since alleging disability on October 15, 2002. (Tr. 17.) In resolving step two in Plaintiff's favor, the ALJ found that he suffered from numerous physical impairments: obesity, cervical and lumbar disc disease, osteoarthritis, carpal tunnel syndrome, bowler's elbow, coronary artery disease, hypertension, hearing loss, migraine headaches, chronic pain syndrome, and sleep apnea. His mental impairments included an adjustment disorder, a depressive disorder, a mood disorder, and an anxiety disorder. (<u>Id.</u>) He further concluded that although Mr. Mahle reported gastritis, gastroesophageal reflux disease ("GERD"), overactive bladder, internal hemorrhoids, and previous bilateral hernias, those impairments did not have more than a minimal impact on his ability to perform work-related activities and were therefore non-severe. As such, the ALJ did not consider those impairments in his subsequent analysis. (Tr. 18.)

At step three, the ALJ concluded that Plaintiff's impairments, taken alone or in combination, did not satisfy any of the criteria

---

[6] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. <u>Sykes</u>, 228 F.3d at 263, n2, *citing* <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146-147 n5 (1987).

in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically Listings

1.00 Musculoskeletal System,[7] 2.00 Special Senses and Speech, 3.00

---

[7]   Plaintiff argues that the ALJ improperly rejected his musculo-
skeletal complaints because he failed to acknowledge "uncontradicted
expert medical evidence supporting an exertional musculoskeletal
problems, with elements of the musculoskeletal listing satisfied."
(Plf.'s Brief at 23.)  In related arguments, he contends that the ALJ
erroneously relied on his own observations to override medical
evidence and opinions of treating physicians Shaughnessy and Kunkel
who diagnosed Plaintiff with cervical radiculitis and lumbar
radiculopathy.  (Plf.'s Brief at 20, *citing* Tr. 569 and 573-576.)
However, he fails to identify which of the seven musculoskeletal
impairments he satisfies.  In reviewing each of those subcategories,
the Court concludes the ALJ did not err in finding that Plaintiff's
impairments did not satisfy any of them.
    Dr. Patrick J. Shaughnessy, who examined Plaintiff three times
between March 26, and April 28, 2004, noted dysfunction in the lumbar
spine and sacral region, but no lower extremity joint alignment
problems, no crepitus with motion and no significant atrophy. His
overall impression was of a sacral cyst, mild left C6 radiculitis
(inflammation of the root of a spinal nerve), bilateral carpal tunnel
syndrome and cervical and lumbar spondylosis (immobility or
consolidation of a vertebral joint or degenerative spinal changes due
to osteoarthritis.)  His final overall musculoskeletal impression was
cervical and lumbar degenerative disc disease.  (Tr. 565-569.)  Dr.
Frank Kunkel, a pain specialist, examined Plaintiff on July 7, 2004.
(Tr. 573-576.)  Dr. Kunkel ordered an MRI to investigate if the
Tarlov's cyst was a possible "fixable" source of his lower back pain.
(Tr. 576.)  Following a second examination on October 11, 2004, Dr.
Kunkel diagnosed him with lumbar radiculopathy (disease of the nerve
roots.)  (Tr. 571.)  On November 11, 2004, Dr. Catherine Cunningham
ordered a series of x-rays of Plaintiff's thoracic and lumbar spine
and knees.  (Tr. 489-490.)  All results were normal, with no evidence
of spondylosis or spondylolisthesis (forward displacement of one
vertebra over another.)
    Contrary to Plaintiff's argument, there is no evidence that he
experiences the "gross anatomical deformity. . . joint space
narrowing, bony destruction, or ankylosis of the affected joint(s),"
together with "an inability to ambulate effectively," which are
required to satisfy Listing 1.02, major dysfunction of a joint due to
any cause.  Nor is there evidence of a spinal disorder accompanied by
nerve root compression, spinal arachnoiditis or lumbar spinal stenosis
sufficient to satisfy Listing 1.04, disorders of the spine.  "For a
claimant to show that his impairment matches a listing, it must meet
all of the specified medical criteria.  An impairment that manifests
only some of those criteria, no matter how severely, does not
qualify." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990); *see also*
<u>Peterson v. Barnhart</u>, 215 F. Supp.2d 439, 448 (D. Del. 2002).
    The Court concludes that the ALJ's summary of the medical

Respiratory System, 4.00 Cardiovascular Systems, 11.00 Neurological, 12.00 Mental Disorders, or any other listed impairments. (Tr. 17-18.) At step four, the ALJ concluded that Mr. Mahle could not perform his previous work as a truck driver or truss builder, activities which the vocational expert ("VE") at the hearing, Mr. Mark L. Heckman, classified as semi-skilled, medium to heavy work activity. (Tr. 23.)

In response to the ALJ's hypothetical question (discussed below), Mr. Heckman stated that there were numerous sedentary jobs such as product inspector, nut sorter, and hand assembler which an individual of Mr. Mahle's age, education, and physical/mental limitations could perform in the local or national economy. (Tr. 24.) Therefore, based on Plaintiff's status as a younger individual[8] with a general equivalency diploma, a work history of semi-skilled occupations, and the medical evidence of record, the ALJ determined at step five that Mr. Mahle was not disabled and,

---

evidence offered by Drs. Shaughnessy, Kunkel and Cunningham is accurate and there is nothing in their records to support Plaintiff's argument that the ALJ relied on his own observations rather than medical evidence. As to his argument that the ALJ further erred by failing to consider his need for hospital care in light of "numerous" in-patient or emergency treatments after October 15, 2002 (Plf.'s Brief at 21), the Court finds that none of the hospitalizations after his onset date were due to vertebrogenic disorders.

[8] Plaintiff was 45 years old at his alleged disability onset date and 47 at the time of the hearing, making him a "younger" person according to Social Security regulations. 20 C.F.R. § 404.1563(c) and § 416.963(c). Plaintiff does not argue that any special circumstances existed which would affect his ability to adjust to work as compared to persons under 45.

consequently, not entitled to benefits.  (Tr. 24.)

    B.  <u>Plaintiff's Arguments</u>

        Plaintiff offers some thirteen reasons why the decision of the ALJ should be reversed and benefits granted without further review.  Many of these are redundant or non-specific and will not be addressed herein.  However, we agree that four aspects of the ALJ's decision lack adequate detail or analysis in order for this Court to determine if his conclusions are based on substantial evidence.  *See* <u>Burnett v. Commissioner of Social Sec. Admin.</u>, 220 F.3d 112, 119-120  (3d Cir. 2000), concluding that remand is the proper course of action where the ALJ's analysis was "beyond meaningful judicial review."  We address in turn:

    1.  the effect of Plaintiff's migraine headaches on his ability to do substantive gainful activity;

    2.  the characterization of Plaintiff's activities of daily living;

    3.  the analysis of Plaintiff's mental health impairments; and

    4.  the weight the ALJ gave to the medical opinions of Plaintiff's long-term treating physicians as compared to the opinions of non-examining state agency physicians, in particular, the conclusions by Drs. Forrest Henry and Gregory Sachs that Plaintiff was "disabled," and those of Dr. Catherine Cunningham regarding his pain and RFC.

        1.  *The ALJ's failure to explain the effect of Plaintiff's migraine headaches on his ability to perform substantial gainful activity:*  According to Plaintiff, the ALJ improperly discounted the effect of his migraine headaches, stating

10

that Plaintiff failed to provide any objective medical test to support his claims. Mr. Mahle contends that "there is no medical evidence in this record to allow the ALJ to conclude that positive tests are required to support the migraine headache diagnosis. Furthermore, . . . this record is replete with inpatient, outpatient, and physician record of treatment illustrating long-standing, severe and lengthy debilitating headaches, triggered and exacerbated by stress." (Plaintiff's Brief, Docket No. 16, "Plf.'s Brief," at 21.) Defendant contends that Plaintiff's headaches were well-controlled by medication prescribed by Dr. Henry, one of Plaintiff's long-term treating physicians[9] (Tr. 264), and that a chiropractor who treated him for neck pain and headaches, Timothy Purcell, had opined in May 2003 that Plaintiff had only moderate limitations in his physical functions despite his headaches. (Defendant's Brief in Support of Her Motion for Summary Judgment, Docket No. 20, "Def.'s Brief," at 6-7.) Consequently, the ALJ was not required to find Plaintiff's headaches "more limiting." (Id. at 22-23.)

---

[9]  Social Security regulations identify three general categories of medical sources – treating, non-treating, and non-examining. 20 C.F.R. § 416.902. Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had an "ongoing treatment relationship" with him are considered treating sources. A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with him, for example, a consultative examiner who is not also a treating source. Id. Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records. Id.

In his analysis, the ALJ found the medical evidence supported Plaintiff's claims of a history of migraine headaches.  He noted that "in September 2003, a CT scan of the head revealed no evidence of an acute abnormality; and an MRI of the brain in October 2003, was essentially normal with no evidence of extra-axial fluid collection or mass lesions."  (Tr. at 19, *citing* Exhibit 25F, Tr. 465 and 468.)  He noted that a July 2004 physical examination by Dr. Frank Kunkel, a pain specialist who treated Plaintiff at Dr. Henry's request, "revealed intact cranial nerves."  The ALJ also commented that Mr. Mahle "has not required frequent hospital confinement/emergency room care due to recurrent headaches; and there is no evidence that claimant's headaches are accompanied by significant complications such as nausea, blurred vision or syncope."  (Tr. 19.)

It is unclear if the ALJ referred to these medical reports in order to refute Plaintiff's claims that his migraine headaches were a severe impairment.  As reported in the medical literature, however, migraine headaches cannot be detected by imaging techniques, laboratory tests, or physical examination, but are linked to disturbances in cranial blood flow.  According to the on-line edition of the <u>Merck Manual</u> home edition,

> Migraines are diagnosed on the basis of symptoms.  No procedure can confirm the diagnosis.  If headaches have developed recently or if the pattern of symptoms has changed, computed tomography (CT) or magnetic resonance imaging (MRI) of the head is performed to exclude other disorders.

*See* www.merck.com, "Migraines."

At the hearing, Plaintiff testified that he experienced "massive headaches" on the right side of his head, three or four times every two weeks, lasting "pretty much all day." (Tr. 742.) He also referred to "throbbing," "lights" and "sound." The headaches are associated with stress. (Tr. 743.) According to the <u>Merck Manual</u>, these symptoms are consistent with migraine headaches. ("A migraine headache is throbbing, moderate to severe pain, usually on one side of the head, that is worsened by physical activity, light, sounds, or smells and that is associated with nausea and vomiting.") "Because there is no test for migraine headaches, 'when presented with documented allegations of symptoms which are entirely consistent with the symptomatology for evaluating the claimed disorder, the [Commissioner] cannot rely on the ALJ's rejection of the claimant's testimony based on the mere absence of objective evidence.'" <u>Federman v. Chater</u>, CA No. 95-2892, 1996 U.S. Dist. LEXIS 2893, *6 (S.D.N.Y. Mar. 11, 1996), *quoting* <u>Fragale v. Chater</u>, 916 F. Supp. 249, 254 (W.D.N.Y. 1996).

While the ALJ was correct in concluding that Plaintiff had not required "frequent" hospital confinement or emergency room treatment due to recurrent headaches, the medical record contains numerous references to ongoing treatment. Mr. Mahle first reported migraine headaches after he was involved in a traffic accident in 1995. (Tr. 275; 460; 595.) On December 14, 2000, he reported to

his primary care physician that his "migraines have been persistent" despite medication.  (Tr. 590.)  He reported migraine headaches secondary to stress in March 2001.  (Tr. 152.)  He received chiropractic treatment from 2002 through 2003 for pain and migraine headaches which he described as "crushing and squeezing." (Tr. 257-259.)  On February 17, August 26, and October 6, 2003, Plaintiff reported headaches to Dr. Henry.  (Tr. 232, 433 and 431, respectively.)  He reported "pulsatile bi-temporal headaches with photo- and phono-phobia" to a neurologist at the Veterans Affairs Medical Center ("VAMC") in Butler, Pennsylvania, on June 4, 2003, and stated that the medication prescribed by Dr. Henry was effective in aborting those headaches.  (Tr. 264-265.)  However, on November 12, 2003, he reported to Dr. Henry that he had been suffering from a headache for three days.[10]  (Tr. 238.)

According to the record, Plaintiff was admitted to Clarion Hospital for intractable headaches on February 13, 2003, accompanied by numbness in his hand.  His wife reported that his headache was so severe, he "wanted to shoot himself."  (Tr. 167-

---

[10]  Defendant's argument that Dr. Henry noted migraine headaches only as a secondary diagnosis when opining that Plaintiff was temporarily disabled in December 2002 (*see* Def.'s Brief at 23) is not persuasive.  In steps three and four of his analysis, the ALJ is required to consider the effect of *all* impairments which he determines at step two to be "severe."  Cadillac v. Barnhart, No. 03-2137, 2003 U.S. App. LEXIS 24888, *11-*12 (3d Cir. Dec. 10, 2003), *citing* 20 C.F.R. §§ 404.1526(a) and 2404.1523 (in assessing eligibility for benefits, the Commissioner "will consider the combined effect of all ... impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.")

169.)  Although a CT scan with and without contrast and an MRI were unremarkable (Tr. 174-175), such tests might rule out other etiologies for severe head pain but would not, as noted above, rule out migraine headaches.

As of March 2003, Plaintiff reported that he was taking three separate drugs for migraine headaches (Tr. 90) – Maxalt, a drug used to treat severe migraine headaches, propranolol, which may prevent migraines, and Imitrex, also used to treat severe migraine headaches and relieve associated symptoms such as nausea, vomiting, sensitivity to light, and sensitivity to sound.  *See* www.nlm.nih.gov/medlineplus and www.merck.com.

The chief problem with the ALJ's treatment of Plaintiff's migraine headaches is that at step two of his analysis, the ALJ listed them among the impairments which Plaintiff claimed limited his ability to perform substantial gainful activity.  (Tr. 17.)  He then concluded that Plaintiff's gastritis, GERD, overactive bladder, internal hemorrhoids, and status post-hernia repair were non-severe impairments,[11] implying (but not explicitly stating) that

---

[11]  Plaintiff argues elsewhere that the ALJ erred by concluding these impairments were non-severe, and, consequently, by failing to include them in his analysis.  (Plf.'s Brief at 20.)  We have been unable to identify any medical report which would support Mr. Mahle's testimony that he experiences uncontrollable incontinence and diarrhea attacks three to five times a month.  (Tr. 728-729, 737-738.)  (See occasional references to reports of irritable bowel syndrome, Tr. 282; peptic ulcer disease, Tr. 471 and 691; diarrhea, Tr. 568, 633-634, 681; and overactive bladder, Tr. 691.)  Similarly, although Mr. Mahle's medical records include occasional diagnoses of GERD (e.g., Tr. 341, 381, 384, 497, 650, 692), those references do not establish that this impairment is "severe."  See 20 C.F.R. §§ 404.1520(c),

the migraines were a severe impairment.  (Tr. 18.)  Once the ALJ

has established that a claimant suffers from an impairment, that

restriction must be considered "severe" unless the evidence

demonstrates that it is merely a "slight abnormality," having "no

more than a minimal effect on an individual's ability to work."

Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546-547 (3d Cir.

2003), *quoting* Social Security Ruling ("SSR") 85-28.[12]  "Reasonable

doubts on severity are to be resolved in favor of the claimant."

Newell, id. at 547.  Here, however, the ALJ made no explicit

finding as to the effect of Plaintiff's migraine headaches.  Nor

did he refer to them when assessing Plaintiff's credibility

regarding his subjective complaints.  (Tr. 21-22.)

The ALJ posed the following hypothetical question to the

_____

404.1521(a), and 140.1521(b), stating that an impairment is severe
only if it significantly limits the claimant's "physical ability to do
basic work activities," i.e., "abilities and aptitudes necessary to do
most jobs, including, for example, walking, standing, sitting,
lifting, pushing, pulling, reaching, carrying or handling," as
compared to "a slight abnormality" which has such a minimal effect
that it would not be expected to interfere with the claimant's ability
to work, regardless of his age, education, or work experience.
Yuckert, 482 U.S. at 149-151.  The claimant has the burden of showing
that the impairment is severe.  Id. at 146, n5.  The Court concludes
that Plaintiff has failed to do so.  Moreover, although the ALJ found
the bladder and bowel problems non-severe, he gave Plaintiff the
benefit of the doubt on this issue by taking these complaints into
account when formulating his hypothetical question.  (Tr. 749-750.)

[12]  "Social Security Rulings are agency rulings published 'under
the authority of the Commissioner of Social Security' and 'are binding
on all components of the Social Security Administration.'"  Sykes, 228
F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1).  "Rulings do not have
the force and effect of the law or regulations but are to be relied
upon as precedents in determining other cases where the facts are
basically the same."  Sykes, id., *quoting* Heckler v. Edwards, 465 U.S.
870, 873 n3 (1984).

Vocational Expert:

> a hypothetical individual with claimant's past education,
> training, work experience and assume that my hypothetical
> person is limited to a sedentary range of work as that
> term is defined under the regulations.[13]   Assume the
> person is limited to occasional postural maneuvers such
> as balancing, stooping, kneeling, crouching, crawling and
> climbing on ramps and stairs on no more than an
> occasional basis.   Assume the person must avoid all
> crawling and climbing on ladders, ropes or scaffolds.
> Assume this person must be afforded the option to sit and
> stand during the workday.  Assume the person is limited
> to occasional pushing and pulling with the upper
> extremities to include the operation of hand levers.
> Assume the person is limited to occupations which do not
> require exposure to dangerous machinery and  unprotected
> heights or the need to converse over excessive background
> noise. . . . Assume the person is limited to occupations
> which can be performed wearing hearing aids.  Assume the
> person is limited to simple, routine, repetitive tasks
> not performed in a fast paced production environment
> involving only simple work related decisions and in
> general relatively few work place changes.  Assume the
> person is limited to occasional interaction with
> supervisors and co-workers and by interaction, I don't
> mean just being in the same place at the same time with
> people.  I mean actually having to subtly [sic] interact
> with those people.   Assume the person must avoid all
> interactions. . . with members of the general public.
> Within those limitations, are there jobs in the national
> or local economy that that hypothetical person could
> perform at the sedentary level?

(Tr. 748-749.)[14]

---

[13]   The term "sedentary" describes work which requires lifting no
more than 10 pounds at a time and occasionally lifting or carrying
articles like docket files, ledgers and small tools.   Jobs are
sedentary even if walking and standing are required occasionally and
other sedentary criteria are met.   20 C.F.R. § 404.1567. A sedentary
job should require no more than approximately 2 hours of standing or
walking per eight-hour work day, and sitting should typically amount
to six hours per eight-hour work day.   SSR 83-10.

[14]   The ALJ later added an additional restriction, limiting the
hypothetical individual to occupations which could be performed while
wearing an incontinence protection pad.   (Tr. 749-750.)

The Court is unable to discern in this description any limitations stemming from Plaintiff's migraine headaches. A proper hypothetical question must reflect "all of a claimant's impairments that are supported by the record" in order for the response by the vocational expert to be considered "substantial evidence." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987).

It should be noted we do not find that the ALJ erred by finding that Plaintiff's headaches were not a severe impairment or by rejecting Plaintiff's testimony about the frequency, duration, and effect thereof. We conclude only that the text of the decision is ambiguous as to whether the ALJ considered the migraine headaches to be a severe or non-severe impairment and, if the former (as seems to be the case), why limitations imposed thereby were not incorporated in the hypothetical question. Accordingly, remand is required for clarification of this issue. *See* Diaz v. Barnhart, CA No. 01-0525, 2002 U.S. Dist. LEXIS 12147, *19-20 (E.D. Pa. 2002), *citing* McCormick v. Sec'y of Health & Human Servs., 861 F.2d 998, 1000 (6th Cir. 1988).

2. *Characterization of Plaintiff's activities of daily living:* Plaintiff argues that the ALJ omitted references to significant limitations Mr. Mahle incorporated when describing his activities of daily living. As a result, the ALJ's conclusions both about Plaintiff's credibility and his ability to perform work-related tasks may be unfounded. (Plf.'s Brief at 22.) We agree.

The ALJ noted the following with regard to Plaintiff's daily activities:

> . . . the claimant reported on a Daily Activities Questionnaire that he is able to drive and leave his home to grocery shop and that his activities include cooking and watching television. (Tr. 17, *citing* Exhibit 4E, Tr. 102-111.)

> As to activities of daily living, there are mild limitations. The claimant reported he is able to care for his personal needs independently, drive, watch television, read the newspaper, use the computer, occasionally dine out at restaurants and perform various household chores such as cooking, washing dishes, and grocery shopping. (Tr. 20, *citing* Exhibit 4E and testimony; repeated essentially verbatim at Tr. 21 in discussing Plaintiff's subjective complaints.)

On the Daily Activities Questionnaire to which the ALJ referred, however, Plaintiff stated that:

> he drove "not any more than I have to," limiting trips to Walmart (4 miles) and to his father's home (5 miles);

> he cooks "small meals" for himself when he is at home alone;

> he was dependent on his girlfriend (later his wife) for assistance in his personal needs such as helping him sit up, getting out of bed, a chair or the bathtub, washing his hair and back, and putting on socks when he is unable to bend his knees;

> he was able to load and unload grocery bags "some days" and was able to carry two bags at once, although he had to sit down "for a while" when shopping.

(Tr. 102-105.)

The ALJ also relied on Plaintiff's testimony regarding his activities of daily living.  He testified in relevant part that he drove his wife to the grocery store, but if the store was crowded,

he stayed in the car in order to "stay out of trouble" with people. (Tr. 731.)  He was able to wash "a few" dishes but could not do laundry because it involved too much stooping and reaching. When he reads the newspaper, he finds it difficult to concentrate, and although he is able to use a computer, it is difficult for him to sit very long.  (Tr. 732.)  When he goes to a restaurant on occasion, he sits "in a corner" in order to avoid interactions. (Tr. 734.)  On a "good day," he can sustain an activity for an hour or two, sometimes a little more, then has to lie down for an hour or two, while on a "bad day," he is able to sustain activity for 30 minutes then has to lie down for 3 or 4 hours; on some days, he is unable to get out of bed at all.  (Tr. 743-744.)

An ALJ's credibility determinations are entitled to great deference and should not be discarded lightly, given his opportunity to observe the claimant's demeanor.  Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).  Activities of daily living are one of several subjective matters an ALJ must consider in evaluating the intensity and persistence of a claimant's symptoms and determining the extent to which those symptoms limit his/her capacity for work.  20 C.F.R. §§ 404.1529(c)(3)(i) and 416.929(c)(3)(i).  However, by omitting the restrictions on those activities noted by Plaintiff in both his testimony and his questionnaire – e.g., he needs assistance with his personal care,

he limits his driving,[15] his ability to grocery shop is limited by both the amount he can carry and his need to rest while shopping – the ALJ may have over-estimated the Plaintiff's residual functional capacity. *See* SSR 96-8p (RFC is an assessment of an individual's maximum ability to do sustained work-related physical and mental activities in a work setting for eight hours a day, 5 days a week, or an equivalent work schedule.)  Moreover, as to Defendant's argument that Plaintiff reported to medical personnel that he could care for his personal needs (Def.'s Brief at 18, *citing* Tr. 166), a single check mark on a hospital intake form indicating that he does not need assistance with daily living hardly constitutes "substantial evidence" which would convince a reasonable mind that he can function independently on a sustained basis.  Nor do we find persuasive Defendant's argument that as late as 2003, Plaintiff reported he was still able to go fishing.  (Def.'s Brief at 5.) When discussing that activity in the questionnaire, he also noted that by 2003, he was no longer able to do more vigorous activities such as playing ball with his son, hunting, swimming, and going on walks at a state park.  (Tr. 104.)

Sporadic or transitory activity such as shopping for the necessities of life does not disprove the inability to maintain

---

[15]   Although Defendant points out that Mr. Mahle drove himself to the hearing before the ALJ, held in Latrobe, Pennsylvania, from his home in Emlenton, Pennsylvania (Def.'s Brief at 19-20), he stated that he did so because there was no one else to drive for him.  (Tr. 730.)

substantial gainful employment.  *See* <u>Smith v. Califano</u>, 637 F.2d 968, 971-972 (3d Cir. 1981).  The law does not require a complete restriction from recreational and other activities as a prerequisite to a finding of disability.  <u>Smith</u>, <u>id.</u> at 971.  ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity.")  On remand, the ALJ should explain why he concluded that the totality of the evidence of Mr. Mahle's activities of daily living – including Plaintiff's stated limitations on his ability to pursue those activities – supports a conclusion that he is able to maintain gainful employment on a regular basis.[16]

      3.   *The ALJ's analysis of Plaintiff's mental health impairments:*  Plaintiff argues that despite documentation of repeated emergency room visits and ongoing treatment for "severe mental health signs and symptoms," the ALJ improperly minimized his mental impairments.  The ALJ also failed to reject, analyze or explain a mental functional assessment by the state agency psychologist, Dr. Manella Link.  (Plf.'s Brief at 20, *citing* Tr. 300-314.)  Plaintiff further contends that the ALJ improperly analyzed his mental health impairments in a number of ways, e.g.,

_____

[16]  We recognize that this a close issue, due to the deference afforded to an ALJ's credibility determinations. However, in light of the guidance set forth in <u>Smith</u>, *supra*, and the fact that there is conflicting evidence regarding Plaintiff's RFC as discussed in section B.4 hereof, we conclude this issue is significant enough to require consideration on remand.

relying on his personal observations to reject the medical evidence, and requiring evidence of psychosis, suicidal or homicidal behavior despite the fact that such behaviors do not pertain to diagnoses of affective disorders or anxiety-related disorders. (Plf.'s Brief at 21 and 24.)

In his decision, the ALJ noted that Mr. Mahle had been diagnosed with adjustment, depressive, mood, and anxiety disorders. (Tr. 19.)  He therefore evaluated Plaintiff's mental impairments under Listings 12.04 Affective Disorders, and 12.06 Anxiety Related Disorders.  The ALJ considered the effect these impairments had on Plaintiff's ability to perform activities of daily living; function in social settings; concentrate, persist or maintain pace at work-related job tasks; and whether he had experienced episodes of decompensation of an extended duration.[17]  He concluded, based on

---

[17]  In this section, the ALJ refers to "B criteria" and "C criteria."  (Tr. 19-20.)  Listings 12.04 and 12.06 require a three-part analysis.  In either listing, a claimant must meet one category A criterion and either two of the four category B criteria or one of the three category C criteria.  The criteria in each category are the same for both Listings.  The "A criteria" relate to medical findings of either affective disorder (Listing 12.04) or anxiety-related disorders (Listing 12.06.)  Here, the ALJ concluded, as stated above, that Mr. Mahle had been diagnosed with adjustment, depressive, mood and anxiety disorders, thus satisfying the "A criteria" for each Listing. Plaintiff's argument that the ALJ erred by failing to analyze the "A criteria" (Plf.'s Brief at 22) is therefore unavailing because if he had not accepted the medical diagnoses at face value, he would have had no reason to continue his analysis.  The "B criteria" require the claimant to show that his mental impairment results in marked restrictions in two of four broad areas of function: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation of extended duration.  The "C criteria" are a medically documented history of a mental impairment lasting for at least two years, resulting in more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently

Plaintiff's testimony and his daily activities questionnaire, that there were mild limitations as to activities of daily living and moderate limitations as to his social functioning, e.g., there was no evidence of legal difficulties due to maladaptive social behavior, he could leave home to grocery shop and occasionally dine out, and he had no difficulty interacting with counsel and engaged in no inappropriate social behavior during the hearing.  (Tr. 20.) He found only moderate limitations with regard to Plaintiff's concentration, persistence, or pace, indicating that he retained the ability to perform simple, repetitive, routine job tasks.  In arriving at this conclusion, the ALJ again relied on Plaintiff's self-reported activities of daily living, the fact that he was able to respond to all questions at the hearing in an appropriate manner with no overt lapses in concentration, and on medical reports from Dr. Frank Kunkel, noting that in July 2004, Mr. Mahle was alert with no signs of addiction, diversion behavior or medication excess (Tr. 576) and from Dr. Barbara J. Wilson, a geropsychologist at the VAMC, who noted in February 2005 that Mr. Mahle demonstrated "coherent and logical thinking, intact insight and judgment and no

---

attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process resulting in such minimal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause decompensatation; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.  Plaintiff does not argue that the ALJ erred by failing to find that he satisfied either Listing 12.04 or 12.06 at step three of his analysis.

signs of psychoses or suicidal/homicidal ideation." (Tr. 20, *citing* Exhibit 37F, Tr. 686-687.) Finally, the ALJ found there was no evidence to satisfy any of the "C criteria." (Tr. 21; *see also* note 17 herein, explaining in detail the B and C criteria.)

Although not explicitly stating his findings as to the severity of Plaintiff's mental impairments, the ALJ clearly considered them when posing the hypothetical question to the Vocational Expert. As noted above, that question limited possible jobs to those involving "simple, routine, repetitive tasks not performed in a fast-paced production environment," "simple work related decisions," "relatively few work place changes," "occasional interaction with supervisors and co-workers," and no interaction with the public. (Tr. 748-749.)

We quickly address three of Plaintiff's arguments on this issue. Regarding the ALJ's alleged reliance on his personal observations, an ALJ does not err by incorporating his own observations of the claimant when ascertaining a claimant's credibility, including statements about the effect of the impairments on his ability to undertake substantive gainful employment. Morales, 225 F.3d at 318. However, such observations alone "do not carry the day and override the medical opinion of a treating physician that is supported by the record." Id. Here, the ALJ observed Mr. Mahle's behavior during the hearing, but he also noted and relied on reports from both Drs. Kunkel and Wilson.

Secondly, the ALJ did not err by requiring evidence of psychoses, suicidal or homicidal ideation.  A fair reading of the ALJ's decision shows that he did not improperly add those factors to his consideration of Listings 12.04 and 12.06 as Plaintiff argues, but rather, such references appear only when the ALJ is describing Dr. Wilson's findings.  (Tr. 20.)  While these references may be extraneous, the ALJ's overall analysis of the Listings in question is properly conducted.

Third, Plaintiff's argument regarding recent in-patient hospitalizations for "severe mental health signs and symptoms" is not supported by the record.  The Court has been able to identify only a single hospitalization due to his mental impairments after the episodes in 1998 when Mr. Mahle was hospitalized twice during a series of marital conflicts.  Mr. Mahle suffered an anxiety attack on February 19, 2003, and was admitted to Clarion Hospital with shortness of breath, nausea, dizziness, and anxiety.  (Tr. 176-187.)  Other hospitalizations noted by Plaintiff refer to anxiety associated with physical problems, but there are no hospitalizations because of depression or anxiety.[18]

---

[18]  In his brief, Plaintiff refers to an admission on March 23, 2003 for shortness of breath and trouble keeping awake (Tr. 206-226) and an admission for chest pains on October 9, 2003 (Tr. 375-396.)  In those instances, medical staff noted associated anxiety, but in neither instance was his mental condition the admitting diagnosis.  He further refers to Tr. 388 and Tr. 565 as evidence of "hospital treatment for anxiety attacks." (Plf.'s Brief at 28.)  The Court has considered those citations and finds that neither of them refers to hospital treatment for anxiety.  In particular, Tr. 565 is Dr. Shaughnessy's office notes referring to a hospital admission in April

While none of these arguments is persuasive, we do agree with Plaintiff that the ALJ may have failed to consider all the medical evidence regarding Mr. Mahle's ongoing treatment for depression and anxiety.   On June 10, 2003,[19] Dr. Manella Link, a state agency psychologist, completed a psychiatric review technique form, noting that Plaintiff had been diagnosed with depressive disorder of non-specific origin and chronic pain syndrome, both of which she analyzed under Listing 12.04.   In reviewing the "B criteria," Dr. Link found that there were mild limitations as to Plaintiff's daily activities and his social functioning, moderate limitations on his ability to concentrate and maintain persistence or pace, and insufficient evidence regarding repeated episodes of decompensation of an extended duration.   Similarly, she concluded there was no evidence to support a finding that Mr. Mahle satisfied any of the "C criteria" of the Listing.   (Tr. 300-312.)

Dr. Link also completed a mental residual functional capacity review (Tr. 313-315) in which she concluded Plaintiff demonstrated at most only moderate limitations in understanding and memory,

---

2004 for an accidental drug overdose.  The medical records for that event do not refer to anxiety or depression.  (*See* Tr. 533-559.)   Tr. 388 is an abnormal ECG dated October 9, 2003, which does not refer to anxiety or depression.

[19]   Although the Social Security Administration noted on June 10, 2003, that Mr. Mahle had been scheduled for a mental evaluation, the interview was apparently cancelled after it was pointed out that there were two recent "acceptable source" opinions from the VAMC in Plaintiff's file.   (Tr. 81.)   As noted above, it is unclear from Dr. Link's review if she considered the May 8, 2003, evaluation.

sustained concentration and persistence, and adaptation to work-related situations. As to social interactions, Dr. Link found no evidence of limitations with regard to any of the detailed points in that category except the ability to ask simple questions or request assistance. She noted that although Mr. Mahle had "several" hospitalizations for his mental impairments, these had occurred only in the "distant past," including two hospitalizations in 1998 when he had both suicidal and homicidal ideation. (Tr. 315; *see also* Tr. 131-139.) After April 1999 when he ceased outpatient psychological consultations (Tr. 140-150) following his hospitalizations, he received no ongoing mental health counseling or treatment until he contacted the VAMC for medical treatment (including psychological analysis and counseling) in early 2003. Dr. Link noted that her perceptions of Mr. Mahle's abilities to make occupational, performance, personal/social and other work related adjustments were "fairly consistent" with the VAMC report of May 28, 2003, and other evidence. (Tr. 315.) In sum, she found the limitations resulting from Mr. Mahle's mental impairments "do not preclude [him] from meeting the basic mental demands of competitive work on a sustained basis." (Tr., id.)

We note first that based on the language used in his analysis of the Listings, it appears the ALJ relied extensively on Dr. Link's report. This is an inference only, however, because as Plaintiff points out, the ALJ does not refer to this evaluation

directly.   Case law requires that the ALJ state the evidence considered which supports the result reached and indicate any evidence which was rejected.  <u>Landeta v. Comm'r of Soc. Sec.</u>, No. 05-3506, 2006 U.S. App. LEXIS 20905, *14 (3d Cir. Aug. 14, 2006), *citing* <u>Cotter v. Harris</u>, 642 F.2d 700, 705 (3d Cir. 1981). Moreover, Dr. Link's report refers only to Dr. Wilson's medical notes from a single interview on May 28, 2003; there is no reference to a May 8, 2003, evaluation at the VAMC in which Plaintiff reported insomnia, poor appetite, some memory loss, anhedonia, low energy, and feelings of worthlessness at times (Tr. 270) or an evaluation by staff psychologist Mark Urich on April 9, 2003 (Tr. 280), diagnosing Mr. Mahle with mood disorder secondary to chronic pain.   Nor is there any evidence that Dr. Link considered Dr. Henry's diagnoses of anxiety and depression dating back to at least May 2002, nor the medical records of his hospital admission in February 2003 following an anxiety attack.  Therefore, the ALJ's reliance on Dr. Link's findings may have been misplaced because she may not have had access to, or may not have considered, all of the relevant medical evidence in Mr. Mahle's file.

Secondly, Dr. Link's report was prepared in June 2003, some 18 months prior to the hearing.  Of the voluminous medical record compiled after that date, the ALJ refers only to a medical examination by Dr. Kunkel and one evaluation by Dr. Wilson.  Dr. Kunkel, as noted above, was a pain specialist, not a mental health

services provider, who saw Plaintiff only on two occasions in July and October 2004.  Similarly, the ALJ refers to Dr. Wilson's February 2005 evaluation, accepting that portion of her report which refers to "coherent and logical thinking, intact insight and judgment and no signs of psychoses or suicidal/homicidal ideation" but failing to consider her report that Mr. Mahle suffered from anxiety, insomnia, decreased energy, worthlessness, low self-esteem, guilt, powerlessness, and mood swings.  (Tr. 686-687, 690.) The ALJ also rejected Dr. Wilson's assessment of Plaintiff's GAF[20] score of 50, describing such a finding as "a subjective scale used to consider psychological, social and occupational functioning on a hypothetical continuum and. . .only reflective of an individual's level of functioning at that particular time."  (Tr. 23.)  As Plaintiff points out,[21] there is no medical evidence in the record

---

[20]  The Global Assessment of Functioning or GAF scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves.  Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n2 (D. Del. Apr. 18, 2002).  "A GAF score of 51-60 indicates moderate symptoms, such as a flat affect, or moderate difficulty in social or occupational functioning.  "A GAF score of 41-50 indicates serious symptoms or serious impairment in social, occupational, or school functioning, such as inability to keep a job." Langley v. Barnhart, 373 F.3d 1116, 1122 n3 (10th Cir. 2004), quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000), at 32.

[21]  In this section, Plaintiff refers to "Dr. Lewis," apparently erroneously, since the references to the transcript make clear that he is referring to the medical records of Dr. Wilson.  Plaintiff also refers here to "the state agency psychological assessment, performed . . . in April 2003."  (Tr. 22.)  The Court has been unable to identify this assessment, unless Mr. Mahle is referring to the April 9, 2003, medical notes by Dr. Urich at the VAMC.

to contradict Dr. Wilson's GAF score, e.g., a contradictory finding by another examining psychologist. Moreover, the fact that GAF may be a subjective conclusion has not precluded its consideration in determining the severity of a claimant's mental impairments. *See*, e.g., <u>Winter v. Barnhart</u>, No. 05-1854, 2005 U.S. App. LEXIS 23791 (3d Cir. Nov. 3, 2005), and <u>Torres v. Barnhart</u>, No. 04-3542, 2005 U.S. App. LEXIS 15282 (3d Cir. July 15, 2004).[22]

The ALJ failed to refer to several significant events in the period between Dr. Link's report and the hearing, for instance:

> Plaintiff's continuing treatment with Dr. Henry for anxiety and depression (*see*, e.g., Tr. 413, 418, 421, 427, 441) and, in particular consultations, on January 18, and April 3 (?), 2004, following anxiety attacks (Tr. 417, 645.)

> Dr. Patrick Shaughnessy's diagnosis on March 26, 2004, of chronic pain syndrome with depression.  (Tr. 569.)

> Reports of anxiety and depression to his VAMC doctors.  (*See*, e.g., Tr. 278, 280, 282-284.)

An ALJ has a duty to consider and weigh all the relevant and pertinent evidence in the record.  <u>Burnett</u>, 220 F.3d at 121 ("although the ALJ may weigh the credibility of the evidence, he

---

[22]  One district court in this Circuit has noted that "the use of the GAF scale . . . is not endorsed by the Social Security Administration because its scores do not have a direct correlation to the disability requirements and standards of the Act."  <u>Lyons v. Barnhart</u>, CA No. 05-104, 2006 U.S. Dist. LEXIS 26320, *16 (W.D. Pa. March 27, 2006), *citing* 65 Fed.Reg. 50746, 50764-65 (2000).  A more accurate statement of the Administration's conclusion is that GAF "does not have a direct correlation to the *severity* requirements in our mental disorders listings" (emphasis added), and that the ALJ is to consider *all* clinical findings in reports by medical sources, taking into account the factors which are used in evaluating any medical opinion evidence, e.g., supportability, consistency and specialization.  20 C.F.R. §§ 404.1527(d) and 416.927(d).

must give some indication of the evidence which he rejects and his reasons(s) for discounting such evidence.")  As the Third Circuit Court of Appeals has directed, the ALJ must

> do more than simply state ultimate factual conclusions. . . . [He] must include subsidiary findings to support the ultimate findings [and provide] not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected.  In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.

Stewart v. Secretary of HEW, 714 F.2d 287, 290 (3d Cir. 1983) (internal quotation omitted).

While the ALJ is not required to identify or refer to every item in the record (Fargnoli v. Halter, 247 F.3d 34, 42 (3d Cir. 2001)), we conclude that there is significant evidence as to the severity of Plaintiff's mental impairments which was not addressed by the ALJ.  Since the ALJ failed to analyze "all evidence" and sufficiently explain the weight given to the evidence identified above, we conclude his decision cannot be described as supported by substantial evidence.  Burnett, id.  Remand is necessary for a complete analysis of the relevant evidence.

4.  *Weight given by the ALJ to the opinions of treating physicians as compared to those of non-examining medical sources:*  Plaintiff raises multiple arguments regarding the opinions of his treating physicians.  First, he argues that in considering his physical limitations, the ALJ improperly gave greater weight to the opinion of a non-examining state agency physician than to those of

his treating physicians.[23]  Second, he argues that the ALJ rejected medical evidence supported by the record and, contrary to controlling law, substituted his own personal observations and analysis. (Plf.'s Brief at 24, 26.)  Third, he claims that the ALJ improperly rejected opinions from his treating physicians for fallacious reasons, e.g., because they failed to complete RFC analyses and offered their opinions in connection with his application for welfare benefits. (Id.)  Finally, he asserts that the ALJ failed to specifically address the medical source statement completed by Dr. Cunningham in which she limited Plaintiff to less than the full range of sedentary work and opined on the effect his pain would have on his ability to perform work activity.  (Id. at 25; see also Tr. 672.)

The ALJ summarized in detail the medical evidence related to Plaintiff's physical impairments, together with relevant evidence from his daily activities questionnaire and testimony. (Tr. 17-19; 21-22.)  He then explicitly referred to three Employability Assessment Forms completed by Dr. Henry in which he indicated Mr. Mahle was temporarily or permanently disabled and to a similar conclusion on the part of Dr. Sachs on August 23, 2004, indicating that he was temporarily disabled from August 9, 2004 through August 7, 2005, due to cervical disc herniation, anxiety and asthma. (Tr.

---

[23]  Plaintiff makes the same argument regarding Dr. Link's evaluation of his mental limitations; this was addressed in the previous section.

353-354.)  Finally, he referred to a residual functional capacity
form prepared by Dr. Cunningham in February 2005.  (Tr. 22.)

The ALJ found that the opinions of Drs. Henry, Sachs and
Cunningham were "inconsistent with the clinical and objective
findings of record," referring to a stress test and cardiac
catheterization in June 2003 which were unremarkable and x-rays of
Plaintiff's knees and spine in November 2004 which showed no
evidence of severe musculosketal impairments.  (Tr. 23.)  He
concluded that

> the State Agency medical consultants who evaluated the
> evidence of record concluded the claimant retained the
> residual functional capacity to perform a wide range of
> work at the light exertional level notwithstanding his
> physical and emotional disorders. . . . Although these
> opinions are entitled to less weight as they were given
> by non-examining physicians, they are considered medical
> opinions and entitled to some weight. . . . Accordingly,
> the [ALJ] is unable to afford controlling weight to the
> above reference[d] opinions.  Based on the totality of
> the evidence, the [ALJ] concludes the claimant retains
> the residual functional capacity to perform a wide range
> of work at the sedentary exertional level.

(Tr. 23.)

The state agency physician's evaluation to which the ALJ
referred was completed by Dr. Frank Bryan on September 3, 2003.
(Tr. 344-353.)  He concluded that Plaintiff could occasionally lift
and carry 20 pounds, could stand or sit for a total of six hours in
an eight-hour work day, and had no limitations on his ability to
push or pull with either his arms or legs.  He had no postural,
manipulative, visual, communicative, or environmental limitations.

(Tr. 345-348.)  In his judgment, Plaintiff's reported severity or duration of his physical symptoms was disproportionate to the expected severity or duration of his impairments, but he did not explain his reasoning on this issue.  (Tr. 348.)[24]  Apparently based on a review of Plaintiff's daily activities questionnaire, Dr. Bryan noted that Plaintiff "qualifies most answers stating that he has to modify his activities because of his handicap. . . . When asked to describe his pain he states on a scale from 1-10, it is an 11.  The pain is worse all over, he is not able to describe an anatomic pathway for the pain."  (Tr. 353.)[25]  He refers to an evaluation completed on January 16, 2003, by Dr. Thomas Freenock, a board certified physistrist.  (*See* Tr. 199-200.)  He notes that Dr. Freenock found "mildly positive carpal tunnel compression test bilaterally," but fails to note that he also found "the patient has not responded to a trial of splinting, so he appears to be a candidate to consider median nerve decompression" (Tr. 200) or to Dr. Freenock's follow-up note describing Plaintiff's condition as

---

[24]  Dr. Bryan also noted that Plaintiff's answers on the questionnaire "are not consistent," which he concluded "strongly suggests symptomatic magnification."  (Tr. 353.)  The Court has been unable to identify any medical source who stated or implied that Plaintiff was malingering or exaggerating the extent of his pain or other subjective symptoms.

[25]  The Court notes, in fairness to Plaintiff, that many of the questions invite the respondent to indicate how he has modified his activities, e.g., "Please describe any changes or limitations" with regard to "the way you do activities that you were able to do in the past."  (Tr. 103.)  Nor is it clear in which question a claimant is asked to describe the "anatomic pathway" for his pain.

"clear cut carpal tunnel syndrome" (Tr. 198.) He also considered a report by Dr. Keith Zeglier [sic], and stated that Dr. Zeliger "felt that the physical examination did not follow the EMG evaluation, did not match the physical examination sentence [sic]. Did not feel that the claimant was a candidate for carpal tunnel release and did not feel that surgery was recommended to address the claimant's discomfort." (Tr. 352.) Dr. Bryan further noted, "There is no indication that the claimant is receiving any consistent treatment for his back complaints. He has recently been evaluated by a physical therapist." (Tr. 352.)[26]

Dr. Henry began treating Plaintiff on a regular basis not later than May 2002. On February 27, 2003, he wrote a general letter stating that Mr. Mahle was unable to work due to anxiety attacks, bilateral carpal tunnel, lumbar back pain, bilateral bowler's elbow and a Tarlov's cyst in his back. He concluded, "There is no way he could ever keep gainful employment." (Tr. 458.) On March 12, 2003, Dr. Henry noted on an employability assessment form for the Pennsylvania Department of Public Welfare ("DPW") that although Plaintiff had followed all prescribed

---

[26] Dr. Bryan did not identify the dates of examination by Dr. Zeliger and the Court has been unable to pinpoint any document on which Dr. Bryan based these remarks. Plaintiff's counsel also referred to Dr. Zeliger's report in a letter to the ALJ on January 31, 2005. (Tr. 124.)Dr. Freenock wrote a letter regarding Plaintiff on March 6, 2003, in which he mentions a consultation by Dr. Keith Zeliger, but if Dr. Zeliger prepared a written report on that consultation, it appears not to be in the record. Similarly, the Court has been unable to identify the "recent" evaluation by a physical therapist to which Dr. Bryan refers.

treatment, he was temporarily disabled for the period December 23, 2002, through October 23, 2003, due to bilateral carpal tunnel syndrome, depression and anxiety.  This conclusion was based on a physical examination, review of medical records, Plaintiff's clinical history, and appropriate tests and diagnostic procedures. (Tr. 651.)  In a second letter dated April 3, 2003, Dr. Henry noted all of the above diagnoses plus bilateral extensor tendonitis and a past history of rectal bleeding.  (Tr. 230.)  On December 15, 2003, he wrote that Plaintiff was unable to work due to "a multitude of health problems. . . . With everything going on and the medications he has to take to function, there is no way David could ever get or keep gainful employment."  (Tr. 650.)  On February 12, 2004, Dr. Henry completed a form indicating that he believed Plaintiff was permanently disabled.  (Tr. 649.)

Dr. Sachs treated Plaintiff for chest pain at Clarion Hospital on September 2, 2004 (Tr. 495), and completed an employability assessment form soon thereafter in which he indicated Mr. Mahle was temporarily disabled from August 9, 2004, through August 7, 2005, due to cervical disc herniation, anxiety, and asthma.  (Tr. 354.) This conclusion was based only on a review of Plaintiff's medical records.

Dr. Cunningham also began treating Plaintiff when he was hospitalized in September 2004.  On February 2, 2005, she completed a questionnaire in which she opined that Mr. Mahle's pain would be

"distracting to adequate performance of daily activities or work;"
physical activities "increase pain to the extent that medication
and/or bed rest is necessary;" and "medication impacts the
individual's work activity to the extent that medication will
severely limit the patient's effectiveness in the work place due to
distraction, inattention, drowsiness, etc." She also completed an
RFC assessment found that he could lift and/or carry less than 10
pounds, stand less than 2 hours, must alternate between sitting and
standing, could not cannot push or pull because of shoulder
limitations, could not kneel, crouch or crawl (e.g., he got on his
knees but was unable to get back up) and limited his requirement to
reach due to a reduced range of shoulder motion and pain. (Tr.
672-676.) As Defendant points out, she stated that her conclusions
in the RFC assessment were based on Plaintiff's subjective
complaints rather than any physical testing of his abilities.

As treating physicians, the conclusions of Drs. Henry, Sachs
and Cunningham were entitled to great, if not controlling, weight.
This is especially with regard to Dr. Henry, whose opinions can be
considered to reflect "expert judgment based on a continuing
observation of the patient's condition over a prolonged time."
Morales, 225 F.3d at 317; see also 20 C.F.R. § 416.927(d)(2)(i)
("Generally, the longer a treating source has treated you and the
more times you have been seen by a treating source, the more weight
we will give to the source's medical opinion.") Where medical

opinions are supported by objective evidence, a hierarchy exists in weighing those opinions.  Controlling weight is given to the medical opinion of a treating physician where it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2).  Here, although the ALJ mentioned the findings of Drs. Henry, Sachs, and Cunningham, he stated that he was "unable to afford controlling weight" to those opinions because he concluded they were not supported by objective evidence.  At the same time, he failed to indicate what weight he did give them vis-a-vis Dr. Bryan's conclusions.[27]  As the Court of Appeals has noted, "the opinions of a claimant's treating physician and of all physicians who examine the claimant are to be given greater deference than those of non-examining physicians." Caballero v. Barnhart, CA No. 02-7402, 2003 U.S. Dist. LEXIS 19485, *33-*34 (E.D. Pa. Sept. 30, 2003), *quoting* Evosevich v. Consolidation Coal Co., 789 F.2d 1021, 1026 (3d Cir. 1986)[28]; *see also*, Adorno v. Shalala, 40 F.3d 43, 47-48 (3d

[27]  The ALJ did not indicate the weight he gave to the opinions of pain specialists Shaughnessy and Kunkel or of the VAMC doctors who treated Plaintiff for numerous physical complaints, all of which are entitled to "some weight" as the opinions of examining physicians and/or specialists.  The Court has been unable to identify any reports by those physicians which offer conflicting evidence to the reports of Drs. Henry, Sachs and Cunningham.

[28]  Although Evosevich was not a Social Security case, as the court noted in Caballero, the Court of Appeals recognized that "the same procedural principles that govern social security cases are applied in black lung proceedings."  2003 U.S. Dist. LEXIS 19485, *34,

Cir. 1994) ("greater weight should be given to the findings of a treating physician than to a physician who has examined the claimant as a consultant" and the least weight given to opinions of non-examining physicians.) "The opinion of a non-examining expert by itself probably cannot constitute substantial evidence to contradict the opinions of examining physicians." Evosevich, id. at 1027.  Based on this guidance, the court in Caballero – faced with a situation similar to that herein where the ALJ discounted the opinion of treating physicians in favor of the opinion of a non-examining medical source – remanded the matter in order for the ALJ to provide further support for his decision. Caballero, id. at *34.  See also Franklin v. Apfel, CA No. 94-1068, 2000 U.S. Dist. LEXIS 13807, *2 (E.D. Pa. Sept. 18, 2000), citing Evosevich, id. for the proposition that "the opinion of the non-examining expert may not form the sole basis for a decision to give less weight to contrary opinions by examining physicians," although "the opinion of a non-examining medical expert may corroborate those of examining physicians and form part of the substantial evidence defeating contrary opinions."

Here, again, the ALJ has failed to give some indication of the evidence which he rejected and his reasons for doing so, for instance, Dr. Cunningham's pain assessment and the effect of his medications, factors which would appear to have a profound effect

n12, citing Evosevich, 789 F.2d at 1027.

on Plaintiff's ability to work on a sustained basis.

As Plaintiff points out, Dr. Bryan noted that there was at least one treating or examining source statement in the file about Plaintiff's limitations which was "significantly different" from his findings, but he did not identify the source of that conflicting statement nor explain why the conflicting conclusion was not supported by the objective evidence in the file. (Plf.'s Brief at 25-26; *see also* Tr. 350.)

It appears from the text of the ALJ's decision that he believed Dr. Bryan was referring to Dr. Henry's statement regarding Mr. Mahle's total disability, a conclusion with which the ALJ agreed. (*See* Tr. 23, *citing* SSR 96-5p, "Medical Source Opinions on Issues Reserved to the Commissioner.")  While the ALJ's comment that opinions (even by treating sources) that an individual is disabled and unable to work are not entitled to controlling weight or special significance is certainly a correct statement of the law (20 C.F.R. § 404.1527(e)(1) and (3)), it does not mean that such opinions are to be rejected *in toto*. *See* SSR 96-5p, stating "[O]ur rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. . . [O]pinions from any medical source on issues reserved to the Commissioner must never be ignored." Here, there is nothing in the ALJ's decision to indicate that he "carefully considered" the opinions by Plaintiff's

treating physicians that he was disabled.

Plaintiff also argues that the ALJ erroneously rejected the opinions of Drs. Henry and Sachs because they "expressed their opinions in connection with the clamant's application for public assistance." (Tr. 23.)  He contends that such a conclusion has an element of trustworthiness because the DPW, like the Social Security administration, does not pay benefits to individuals who are not precluded from work activity.  Moreover, there is case law that disability determinations by other agencies must be given substantial weight.  (Plf.'s Brief at 25, *citing* Kane v. Heckler, 776 F.2d 1130, 1135 (3d Cir. 1985.)

Plaintiff testified at the hearing that his only source of income was public assistance from the DPW, from which one may infer that the agency had determined he was disabled.  (Tr. 721.)  A decision as to disability made by another agency does not bind the Social Security Administration.  20 C.F.R. §§ 404.1504, 416.904. However, it is evidence that the ALJ must consider and explain why if he does not find it persuasive.  Sell v. Barnhart, CA No. 02-8617, 2003 U.S. Dist. LEXIS 21066, *3 (E.D. Pa. Nov. 17, 2003). The Third Circuit Court of Appeals has held that the underlying medical opinion on which another government agency based its disability determination is entitled to substantial weight.  *See* Lewis v. Califano, 616 F.2d 73, 76 (3d Cir. 1980) (conclusion that plaintiff "cannot work" by doctor hired to assist plaintiff in

obtaining county welfare benefits was entitled to "substantial weight"); Sell, id.; Jones v. Barnhart, CA No. 03-6660, 2005 U.S. Dist. LEXIS 17621, *24-*25 (E.D. Pa. Aug. 23, 2005); Somenski v. Barnhart, CA No. 05-3545, 2006 U.S. Dist. LEXIS 7854, *23-*24 (E. D. Pa. Mar. 1, 2006).

The ALJ has an obligation "to provide an adequate basis so that the reviewing court can determine whether the administrative decision is based on substantial evidence." Cotter, 642 F.2d at 706 ("there is a particularly acute need for some explanation by the ALJ when s/he has rejected relevant evidence or when there is conflicting probative evidence in the record.")  As the Court of Appeals has pointed out, absent such an explanation, the court is "handicapped" because it is "impossible to determine whether the ALJ's finding . . . is supported by substantial evidence." Fargnoli, 247 F.3d at 40.

Again, the issue here is not that the ALJ made an improper decision in rejecting the medical opinions as to the extent of Plaintiff's disability or the DPW's decision that he was entitled to state benefits.  However, under Third Circuit controlling law, the failure to explain what weight he gave to the opinions of treating physicians that Plaintiff was unable to work was error. In addition, the ALJ should clarify on remand the weight he gave to the DPW's conclusion that Mr. Mahle was disabled and explain the

basis on which he reached a contrary conclusion.[29]

## V.   FURTHER PROCEEDINGS

Under 42 U.S.C. § 405(g), a district court may, at its discretion, affirm, modify or reverse the Secretary's final decision with or without remand for additional hearings. However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), quoting Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

Because it is unclear (1) how the ALJ incorporated the limitations imposed by Plaintiff's migraine headaches; (2) whether he considered the limitations described by Plaintiff in performing activities of daily living and/or found those descriptions not credible; (3) the extent to which the ALJ considered Plaintiff's mental health impairments; and (4) why the ALJ seems to have rejected the opinions of Plaintiff's treating physicians in favor

---

[29]   Plaintiff's final argument on this issue is that the ALJ improperly rejected the opinions of Drs. Henry and Sachs because neither doctor completed a residual functional capacity assessment of his ability to perform work-related activities.  (Plf.'s Brief at 24; see also Tr. 23.) As Plaintiff points out, there is no evidence that either was asked to complete such an assessment and refused, nor is there evidence that DPW requires such a form in granting disability benefits.  See Mason v. Shalala, 994 F.2d 1058, 1068 n15 (3d Cir. 1993) (a physician's silence on an issue is not evidence of a medical conclusion.)  Standing alone, this argument would not be sufficient to require remand for further consideration but we mention it here for the sake of completeness.

of the non-examining stage agency evaluations, we conclude that remand is the most appropriate action in order for the ALJ to clarify his findings.  An appropriate order follows.


September _____, 2006          _____
                                      William L. Standish
                                      United States District Judge


cc:  James Bukac
     Bukac & Toomey
     Two East Second Street
     Oil City, PA 16301
     Email: bukac.toomey@adelphia.net

     Christian A. Trabold
     United States Attorney's Office
     17 South Park Row
     Room A330
     Erie, PA 16501
     Email: christian.a.trabold@usdoj.gov